Our next case is Michael Nahas versus City of Pittsburgh. It's number 25-2592. We'll hear it first from Mr. Coliani. Good morning. May it please the court. My name is Vince Coliani on behalf of appellant Michael Nahas, and I would like to reserve three minutes for rebuttal. The district court erred in dismissing the complaint with prejudice. The court erred in finding that the complaint did not contain sufficient facts showing that the police officers increased the risk of harm to Ms. McCoy, took affirmative actions that increased the risk of harm to McCoy. The complaint alleges affirmative action. It alleges that the police separated her from her friend and companion, Ms. Crawford Clayton, and impounded her car. That is affirmative action. The court also found that these actions did not increase the risk of harm to Ms. McCoy because her friend was drunk and could not have helped her. So taking her friend away did not make her more vulnerable to danger, which is the fourth element of the state created danger doctrine. The court erred, it inferred by inferring and drawing inference in favor of the defendant, that her friend could not protect her. Albeit she was allegedly intoxicated, she was charged with driving under the influence, but certainly someone can be impaired, legally impaired, not able to drive, but still be capable of protecting a friend, still be capable of exercising enough judgment and reason and physical acuity to take care of someone. Can we just back up for one minute here, and I want to go to the place where we requested the supplemental brief.  So, I think Munoz and some of the other cases we cited sort of give us some instructions about how to think about this, and it starts with a careful description of the right being asserted. And there's some quotes in the briefing about what the district court thought that was. Can you do that for me? What defined carefully the right that we're talking about here? The right under the state created danger would be the right to be free from affirmative conduct of the state that places someone in more danger than they would have been had the state not intervened. We believe, and I said in the supplemental briefing, that after Munoz, after Dobbs, and probably before that, if you follow Descheny and read Descheny the way I think it was intended to be read, there has to be another element, and that's the constraint of liberty. So the affirmative act is not enough, it actually has to be an affirmative act that constrains one's liberty to the extent that they can't act on their own behalf. And I think that was the key holding of Descheny. It says what triggers the due process clause is an affirmative act by the state that renders someone incapable of taking care of themselves. So there has to be a restraint of liberty. And I think this court did that in Mears. Now, it didn't do it explicitly, it didn't redefine the elements, but it did, I think, add a caveat and said, hey, there has to be a restraint of liberty, it's not enough just to have an affirmative act. And I think that's right. And I think our case fits squarely within that test, because we have a situation where she was, Ms. McCoy was restrained, her friend was taken away, she lost access to her protection, her car was taken away. So certainly the state did something that constrained her ability to act on her own behalf. Okay, so that's, I think, sort of the preliminary step under Glucksberg, Dobbs, Munoz. Then we look to whether there's a history and tradition of a right like that. And I understand your point about Descheny, and let's assume that I don't think that Descheny alone sets out a tradition. And, you know, I think back to, and you have to, policing in the UK, pre-colonies, if somebody got picked up in a situation like this, does that officer have some kind of obligation to protect somebody else out in the middle of a pasture? Or you think about in the colonies, same scenario. It's hard for me to picture an officer, a lot of them working privately, some of them working to win prizes, to win rewards, that they had some kind of obligation to protect others that were not the subject of arrests. Do you have different historical data points that we should be thinking about on history and tradition? No, I mean, I think that's right. And I think Descheny, in fact, says that there is not a due process right based on, there's not, based on the text of the due process clause, there's not a right to, for an individual to have the state affirmatively protect them. There's not affirmative right to protection. You can't sue the police because they didn't arrest someone who assaulted you or didn't prevent you from being attacked in the street because they drove by and weren't paying attention. Obviously, there's not, and I think Descheny emphasizes this point, that there is no such right. It's not in the text of the due process clause. It certainly, I believe, as you pointed out, is not consistent with the history and tradition of this country where you have an affirmative obligation to protect. And that the purpose of the due process clause is to protect people from abuses of government power, not to, and I think Descheny said this, I'm paraphrasing, not to protect, not to have a right for the state to protect you from private harm. So I think, yes, one, the history and tradition would suggest there's not an affirmative right absent a restraint on liberty that would prevent you from taking care of yourself, from protecting yourself. You know, in terms of this inference that this court and other courts have made from Descheny on the restraint of liberty, isn't it a kind of a before and after compare in the sense of what was your level of danger beforehand? Now your liberty's been restrained. What's your level of danger afterwards? And it may be, and we've got this interesting thing of like, it may be a different type of danger afterwards. And it seems that some of our cases allow a danger swapping almost. You were exposed to one sort of danger beforehand, passenger in a DUI vehicle, pretty dangerous, I think a lot of people would say. We swapped it for another sort of danger. You know, but a lot, Descheny, I think, says, hey, look, if there's no danger in enhancement, if the inference from Descheny, if it doesn't get bigger, then we can't really blame the state because a lot of times when the state puts its footprints on something and restrains liberty, just the pieces aren't going to go back into place perfectly. The puzzle's not going to fit back into place all the same. And so there's always, not always, in Descheny there might not have been, but often there'll be a difference. Don't you have to show that there'd be kind of some huge delta here in the sense that, look, there was just, not that there was a new danger, but that the overall level of dangerousness increased appreciably? I'm not sure there needs, I hear your point. I'm not sure there needs to be a huge delta. I think Descheny, I mean, the dictum Descheny and what this court has held and many other circuits have held, there has to be an increased risk of harm. Was the person more vulnerable to danger after the police had intervened than before? And you're right, I mean, the nature of the harm could differ. She was in danger with her friend in the car, arguably. She drove up on a median. We think the complaint fairly alleges that she was made more vulnerable to harm by taking away that friend who, while she may have been impaired, wasn't impaired to the point where she couldn't take care of her friend and keep her from walking into traffic. And they took her car away. So to your point, Judge, I agree. I think there obviously has to be an increase. I'm not sure if the delta has to be significant. I don't think that's what the case law says. I'm not sure that's what I would read Descheny that way. But there certainly has to be an increase. Does your complaint allege that the car was still functional and the friend was still driving at the time when the police arrived? No, it doesn't actually. The car may have been functional. The complaint, I believe, alleges she drove up onto a median and was stuck and someone called the police. The police came. They did a field sobriety test. They arrested the driver who was the friend. It was actually Ms. McCoy's car. They arrest the driver. They impound her car. They leave her in the middle of the bridge. She walks into the oncoming traffic. Maybe the delta that we're looking for is between being stuck in or near a car on the median versus what happened after the police left. And I think that's right. And the delta being deprived of a friend and protector. And that's what you have in NEP and what started this whole doctrine in this circuit. And we've kind of come full circle. These facts are so similar. So, yes, she may have been in peril at some peril at that point. But by separating her from her friend and taking away the car, they increased the risk of harm. She could have waited in the car. Perhaps someone would have come and helped her. If her friend was there, they could have got out of the car. Her friend was certainly less impaired than her. We can fairly infer that from the complaint. The friend could have helped her at least not walk into traffic and walk to a safe place. Why can we fairly infer that from the complaint? And what in the complaint supports an inference of this protector-protecting relationship that you're talking about? And I think the complaint's on a model specificity, certainly. But in paragraph 77, it's appendix 42. It alleges that the officer separated Ms. McCoy from her friend, deprived her of the shelter of a vehicle. I believe you can infer by separating her from her friend that this friend would have provided some protection. And at least enough to prevent her from walking into the middle of traffic. She's fall down drunk, Ms. McCoy. And the friend, I think you can fairly infer or reasonably infer that the friend would have provided a measure of protection that would have kept her from getting hit by a car. So, you know, just on structure of law, you know, NEAP was, I want to say, a 1996 decision. Luxburg is a 1997 decision that kind of announces a new test for how we're going to recognize liberty interest under the due process clause. This circuit has probably done, I would say, between two dozen and three dozen state-created danger cases after NEAP. Have any of those ever addressed whether NEAP can survive the new standard that was announced the year after NEAP was decided in Luxburg? Have any of them done a Luxburg-based analysis on those? No, I mean, no, they haven't. It's the short answer. Now, there are other cases in the circuit where the court has found a constraint of liberty requirement. I'm thinking of Bright, where there was a specific finding that his liberty was not constrained. He was still able to take care of his family. The police may not have warned him, but no one prevented him from taking care of his family. This is a constraint of liberty. I don't think anyone has addressed the effect of Luxburg directly, Dobbs, Munoz, and we've only had a few cases since Dobbs. I go back to Mears, which I think kind of prefigures the Dobbs analysis. We're kind of in this very interesting scenario, then, where we've got this doctrine that's developed in 1996. We've carried it out, and we never kind of stopped to just mark to market, so to speak, by saying, does this work with what the Supreme Court says? I get why we would do that, just court behaviorally, but we now know that Luxburg's for real. All of the circuits have done Luxburg again and again and again, and if we didn't believe that the Supreme Court was true to its word, I mean, Dobbs is pretty monumental in its own right, and then we get Munoz again, and those both bank into Luxburg. So do you think that it would be appropriate for us to reevaluate the whole notion of state-created doctrine against the Luxburg formulation sooner or later? I mean it seems like we're on borrowed time. Sooner or later, we're going to have to mark that to market, right? And I think the Ninth Circuit recently points this out, that that circuit needs to revisit their doctrine in light of Dobbs and Munoz. Certainly, the Fifth Circuit has never recognized the doctrine at all. Yes, I think the answer is yes, but I don't think you fill the baby out with the bathwater. I think you go back to De Cheney, you go back to the text of the Due Process Clause. If there's a restraint on liberty, and that is an element that is included in the fourth prong, or you qualify the fourth prong like Judge Bevis did in Mears, then I think you have a doctrine that survives Dobbs. I mean in NEP, you have a situation very similar to this. You have coercive state action that restrains someone's liberty. The court did not include that specifically as an element when it laid out the four elements of the state-created doctrine. For the first time in this circuit, then you have Breit and say, no, there has to be this caveat or this qualification. And now you have, I think, an opportune time after Dobbs to revisit this and redefine it perhaps. But I think Judge Bevis has done that. It's hard, Bill, because at least the history and tradition test that's laid out in Glucksburg kind of suggests we're looking at about 700 years of history and tradition. We're looking to see, is something deeply rooted? Are we seeing evidence of this? Glucksburg, are we seeing evidence of physician-assisted suicide for American history, colonial history, Anglo-American history? And it's looking at all of that. And I guess, are we seeing evidence? Because I think we'd want to see evidence of Dobbs. Do we see abortion being something that's just absolutely protected for that previous 700 years such that we could infer it? And so I'm looking, it's hard to find this, but I'm looking for something that says, yes, for all of American history, colonial history, Anglo-American history, we've protected this. And when the state puts someone after restraint of liberty in a worse position, oh my goodness, yeah, come to bear. That's actionable. What's the data set look like in that respect? Because I've taken a look and I'm not seeing too much. I'm seeing restatements of torts, recognizing this maybe in the 20th century, early and mid 20th centuries. I think that would be probably or close to pretty good evidence in some respects. But if we're looking at a 700 year timeline and we've got the last 70 years, that might not be deeply rooted. It might be recently rooted. So what gets us to kind of the, what are your thoughts about this deeply rooted? Do we have people suing? Do we have government saying this is reprehensible? What do we have at this period to say, yeah, post-restraint, you've got a liberty interest and we want to recognize that. I think you have a history that arises out of the confinement situation where you have persons who are institutionalized or in prison or jail. And courts have found that there's an obligation to protect them, to provide them with medical care, to protect them from private harm because they can't protect themselves. De Cheney certainly recognizes that as a fundamental substantive due process, right? Whether by incorporating the Eighth Amendment or just using the Due Process Clause and seeing it as a fundamental right. So I think that's my answer to the history. I think we have that history. We have De Cheney that basically says, that refers to that history and then says or suggests there absolutely has to be a constraint of liberty to have any, for there to be an affirmative obligation on the part of the state. And the confinement, at least the rationale, can be extended to not just formal institutional confinement, but to situations where your liberty has been constrained to the extent you can't take care of yourself. So let me just postulate where I would look for this. The area that I would look the most for this, for the confinement, would be release from prison. Right. I would say some prisons are very, very remote. What's the history and tradition on releasing a person from prison? If a person is in prison in the middle of nowhere and they get released from prison and they're hungry and it's a hundred mile walk to anywhere, you might be in really bad shape if you're released from prison there. Do we begin to say, no, no, no, the state would never, ever do that. The state just doesn't say, you know, goodbye, leave, you know, good luck with the next hundred miles back to civilization. We'll get to transportation to your home. We'll do this stuff. That's the area that I would probably look the most because prison is obviously, you know, restraint of liberty. And you're obviously not in, you're not always in a great place when you're in prison. But if the state puts you there and you say, no, I've got no ride, looks like I'm walking a hundred miles or hitchhiking a hundred miles or something else a hundred miles. Do you have any data on that in terms of release from prison? Because that's the set I'd look at if we said, no, the state always makes sure that you're safe when you're out of prison. Then you can begin to make a case that post restraint, we want to put you, we have to take care of you. It's a thought provoking analogy. I mean, I understand the point. I don't have any history. I think in that situation, post confinement, you're released. You're not in a situation where you've been deprived going forward of any private source of protection. I understand you've been released from custody, but I think that's slightly different. Yes. I mean, I'm not sure that arises to a constitutional duty at that point to protect a prisoner after he's been released, even if it's in. Bradford Woods. Bradford Woods. And you're remote and potentially you could, you know, you could, you could, you could freeze or you could become imperiled. Just I just want to understand the scope of your answers here, because I understood. Just to be asking about like the last 700 years of history and in England and in the colonies, you know, pre founding of the United States of America. And so I have have you done or referred to any sort of actual like historical analysis of legal history in the colonies or in colonial United States? No, your honor. OK, so so so when you're referencing the Cheney and and its view of history, you're talking about sort of modern.  Modern discussions of history, but you haven't done that sort of independent research. I have not. No. And going back to case law that that where you have delivered indifference cases where prisoners have been denied medical care are not protected. I don't I don't. I mean, I know there's there's consistent case law that's well established law. But in terms of going back to to the common law and to into to our history and the tradition. No, I don't. I haven't done that dive. I haven't done that analysis. Thank you. Next case. Hey, Miss Clark. Thank you. May please the court. My name is Julie Corrin. I work for the city of Pittsburgh Law Department and I represent the appellees in this case, Emily Shields, Michael Sokoloski and Zachary Norman. The appellees in this case are asking this court to affirm the lower court and to seriously consider issuing an opinion that examines and rejects the state created danger claim in the Third Circuit. We're asking this because the test for these claims and the theory underlying these claims does not comport with the test for substantive due process. As explained in Glucksburg and clarified in recent cases like jobs, immunos. The test the Supreme Court has recently emphasized for liberty interest in the 14th Amendment is a test that requires courts to when there's not an explicit reference in the Constitution to have a careful. Conscription or careful description of the right at issue and then to determine whether that liberty interest is deeply rooted in this nation's history and tradition and implicit in the concept of order liberty. And in Glucksburg, it's an excellent example of how this test works. The court does go back hundreds of years and determines how society and laws viewed assisted suicide and whether or not there was a right to that particular liberty interest and determined that there was not. The Supreme Court indicated in Dobbs that the substantive due process rights of the 14th Amendment that are unenumerated have been controversial and I believe even uses the term treacherous for the court's reading. There's two major issues that the court pointed out about substantive due process liberty interest in the 14th Amendment. And the first is that there is a concern that the raw exercise of judicial power, or the exercise of raw judicial power replaces the democratic or political process that the states have. By having a judge insert their own sense of liberty into what those liberty interests could be. And although this sounds very similar. The second concern that's sort of explained in Dobbs is that courts must guard against the natural human tendency to confuse what that amendment protects with their own argued views about the liberty interests Americans should enjoy. This second concern explained in Dobbs is really highlighted by some of the concerns about state created danger claims like the ones we have in the Third Circuit. In DeShaney, which is really where we start accelerating state created danger claims in many different circuits, the Supreme Court said judges and lawyers like other humans are moved by natural sympathy in a tragic case and I'm paraphrasing, in a tragic case to find adequate compensation for the grievous harm inflicted upon them, but before yielding to that impulse is well to remember once again that the harm was inflicted by a third party and not necessarily by the state. I would submit to the court that those two concerns echo one another or the or the concern in DeShaney really echoes some of the issues that are brought up about substantive due process on enumerated liberty rights in Dobbs and Munoz. I understand your argument is, we should rethink this and we should do the, the Luxembourg inquiry. And so I'll ask you the same question I asked Mr. Kalyani, have you done a, a, or surveyed the, the history of the last 700 years with regard to this specific issue in this case? In our briefing, I touch on the point that courts are considering the, what might be considered an impermissible expansion or ever expanding set of rights under the 14th Amendment, and that there is a call at this time to reexamine these rights. And I can argue, Your Honor, that these rights don't necessarily go back into our history's nation and tradition. Have you or have you not done? I have researched it since we had the letter brief, and I believe that the jurisprudence goes back to when the 14th Amendment sort of is established. The first, I would say, really significant developments in the liberty interests that are unenumerated rights probably comes with the Lochner era, that goes to a lot of freedoms to contract freedoms in the business sense. And then we fast forward sort of to the 1970s where we see Roe v. Wade and we see a lot of the development of substantive due process rights inherent to people's privacy and bodily autonomy that are really under consideration by the Supreme Court now as we've seen in Dobbs immunos. I'm sorry to interrupt, but what about, you know, I asked your opposing counsel about the release from prison example, because I think that the strongest case that can be made for state created danger is that look, when the state takes you in, you know, restrains your liberty, it can't leave you worse off on the back end. And then my mind just gravitates to, well, the biggest restraint of liberty is typically going to be, you know, some form of confinement. It might be prison. There was an era where states were very into civil confinement in terms of asylums and stuff like this, but I don't, so it doesn't necessarily have to be prison, but some form of kind of state ordered restraint of liberty in terms of your dwelling and where you're going to go and then release. It would make a lot of sense to me if we just had a huge population of cases or something else that says, no, no, no, don't leave them worse off. You've released this person from prison, not 100 miles away. You've just released this person from a mental health institution. Please don't do so without all of the other qualifiers on that that would make them safe to live in society. And if we begin to see that as a protected liberty interest, then maybe we can make a case that, no, this is legitimately deeply rooted in history and tradition. Do you see anything like that? Have you looked at that one? And if you have, do you see anything like that? Yes, Your Honor. I believe that there is some evidence in our, even in the Third Circuit cases that consider, so you, if I understand your question correctly, Judge Phipps, we're talking about a prison context of incarceration and then being released. I believe what the courts would have to do would be to look at whether or not there were Supreme Court cases or cases from our circuit, which I do not believe that there are any, about the bare minimum requirements for release. There's probably numerous policies about how a release is handled, depending probably a lot on how long the person has been incarcerated and how long, really, some changes or their support on the outside. I know there's probably policies about people being released into the custodian of a parole agent or what you might call that. I disagree that there's, or I'm not aware of any Supreme Court or circuit cases that say there's a constitutional right to be specifically put somewhere after you've been incarcerated for your own care. And one, one issue in these, in substantive due process, so to date created danger claims, it sort of highlights the issue that there are not cases that specifically tell us that this is deeply rooted in our nation's history and tradition, is that there's often, it's difficult to pin down not only what the right is, not only whether or not it's an affirmative or a negative action, but even who the special relationship is with. There's a lot of discussion, and even in your example, is the relationship with the person who's being released from the prison to keep that individual safe, or is the relationship with that person in the context of keeping the greater general public safe? Now, the Third Circuit has rejected cases as far back as, I think, Mark v. Hatboro, that the general public is not, when there's a special relationship, like you might find in an incarceration setting, is not entitled to special care or special protection or an affirmative action or duty from the state to protect them, generally. And so in the Third Circuit, we start seeing these cases being looked at in the 90s, so about 10 years, or very shortly after DeShaney, and it's adopted in ninth. And in that particular case, we see that the court says it's the set of facts that triggers the willingness to examine this theory. Are you suggesting that we need to look at Third Circuit cases to assess whether something is deeply rooted in this nation's history and tradition? Yes, Your Honor. I think in terms of the history and the more recent cases interpreting the Constitution, especially those in our own circuit, would be relevant to look at where the right comes from and where it can be found in the Constitution in terms of whether it's a deeply rooted right in our history and tradition. And a look to other circuits would not be a bad idea either. I mean, we can see in many different circuits, we have many different tests. Courts have really worked, and really, DeShaney accelerates everything, and that's not in the context of the greater history of the nation that long ago. We have some courts that have rejected it or have never applied it, and that's the Fifth Circuit. They have two elements. We have some circuits that have three elements to the test, and we have our circuit that has four elements. And even just looking at the way this type of claim has been adopted in our modern history is informative to this court as to where a court would be able to find these liberty rights in the Constitution. I'm presuming that your alternative position is that even if the doctrine survives, you still win. Yes, Your Honor. I agree with that statement. You have five minutes. Do you want to speak a little bit about that? Yes, I do. Your Honor, in this particular case, we know that there's four elements in the Third Circuit to state created danger, foreseeability or direct harm, culpability that shocks the conscious, which is a spectrum. And I hate to go back to what we were just talking about, but this is where the ardent views of liberty of the person finding the facts of the case or determining the constitutional right really would slip into this particular type of claim. Special relationship and affirmative use of authority. The foreseeability case here, I mean, in some ways, you can foresee anything. We're talking about a jail that's in the middle of nowhere. Someone's been incarcerated. They have to walk home. It's foreseeable something could happen to them along the way. But we have a jail right here, I believe, in Philadelphia. It's not operable anymore. That's right in the middle of the city. A whole different set of foreseeable dangers would happen there. And I think DeShaney describes those as the dangers of the world. It has to be something that the actions of the state actor precipitated or the catalyst of the injury. And we have some case law, I think that there's one unpublished case that uses the term, a causal chain, and Van Orden v. Borough of Woodstown. And that I believe is extremely relevant in this case. The causal chain here is not put into action or the catalyst of the injury. The officers are sort of one step along. We have a complaint that alleges, although the claims have been withdrawn, the complaint alleges that part of the responsibility of this is one of the establishments that serve these two women alcohol. The two women get in a car. One of them is not permitted to drive because she doesn't have a license and she is intoxicated. They go to another bar where Miss McCoy is not permitted to drink and Miss Crawford is permitted to drink. Now, we did have some discussion about the inference of the level of intoxication of Miss Crawford. When time goes by and someone's not drinking, it's within the kin or knowledge of a regular person that your blood alcohol level goes down. When you're drinking, it goes up. So there is some inference that could be made that while they're drinking at this second establishment, that the circumstances change from the first. But those are not the inferences that are really supported by NEAP. Right. There's some factual distinctions between this case and NEAP, and you cite them in your brief, and I'll grant you that. But that sort of looking back that far into the evening, to the beginning, to when the, I think, husband and wife started drinking, that wasn't really the frame of reference we use in that case. I would agree that in NEAP, the frame of reference starts really with the officers detaining those individuals. And the big distinction between the two, which you could call detentions here, and I sort of dispute that there was beyond a short detention, a detention of Miss McCoy, is that in NEAP, the husband and wife are on their way home. The husband is viewed as the protector for, I guess, numerous reasons that are listed in the case, that he is her wife, that he is less intoxicated, that he indicates they're on their way home to get their children. In this particular case, the two women are already stranded. The car is inoperable. It's alleged in the complaint that it is inoperable. We have a number of cases that are cited by the district court, and I believe in our briefs, that talk about different types of state-created danger claims, where people are left in a car when they're drunk, or left with a car that's still operable. There's many different foreseeable dangers if the officers had left Miss Crawford and Miss McCoy there together with an inoperable car, that are very similar, if not identical, to the very harm that Miss McCoy ultimately and tragically suffered. So, the very nature of the initial interference or interaction of the police is really distinguishable between those two particular cases. It is not a reasonable inference, and that's what the court has to grant, to infer, it's not an automatic inference, that Miss Crawford was a protector, like you saw in NEAP. There's no discussion that they're on their way home when this accident occurs. There's not necessarily even an allegation. The allegation in this case is a negative act. The negative act is that the officers didn't take Miss McCoy, after Miss Crawford was removed, to a safe place. And it gives examples like home, a friend's house, to the police station. We also have a body of case law in our jurisdiction and in other jurisdictions where those very places also were not safe. So, it is really hard to pin down what it means to be in a safe place, and that means it's difficult to pin down what the actual right at issue in this particular case is. And the judge in the lower court did explain that she took into consideration the arguments of what the conscripted or descriptive right was. In the lower court, the appellant argued that it was the right to be free from state-created danger. It was sort of refined today, but really it was the same estimation of what we would explain generally a state-created danger to be. The officers argued that it was the right to be placed into custody in order to make sure an individual gets home, or a right to be placed into custody for your safety. There is no right in the Constitution that guarantees any kind of liberty and trust like that. And then the court specified it, and I'll wrap myself up here, that officers failed to ensure Ms. McCoy arrived at a safe location when they left her alone, intoxicated in the middle of the night in a busy intersection. And I would just, again, in conclusion, urge this court to re-examine the history of state-created danger claims under the Glucksburg test. And I would argue that it has been expanded impermissibly to sort of a constitutional negligence, which needs to be either rejected or refined. Thank you. Thank you. I want to address briefly NEP and the distinctions. In NEP, the court says numerous times the husband was drunk. They were both drunk. They were both very drunk. Nonetheless, it found that by separating the woman from her husband, it increased the risk of harm to her. To me, the distinction is the assurance that, quote, the officer was going to assist his wife to safety. I think that's tough for you here. You mean in NEP, the representation? Yeah. What do you make of that as a distinction? Well, I think that the representation itself is not what's important. I think if you look at the doctrine in this circuit, there's cases that repeatedly stress that a promise assurance is not enough to trigger the doctrine. So the key fact in NEP was not so much those assurances but the restraint on her liberty and preventing her from accessing a private source of protection. On a day when we're talking a lot about the potential for modifying or abrogating or recognizing abrogations of this doctrine, you just brought one up, which is that we have subsequent precedential cases emphasizing the distinction between an assurance and an affirmative act. But in the case where we recognize the doctrine, that's something that I think the analysis maybe not turned on, but it was significant, the undertaking to protect her that night. I think you're right. It was something the court mentioned. It's something the court thought was significant. In subsequent cases, that was clarified, and I think it comes from Descheny as well, that affirmative assurances of protection are not sufficient. But it seems like your position would elevate that assurance in NEP, NIPE, however we're saying it, to a constitutional right. I think on your theory, said or not, the officers had a substantive due process obligation to assist her to safety. Once they constrained her liberty and deprived her of the ability to protect herself. They had an obligation. Can I give you a hypothetical about this? This notion of return to safety is – it's a tough one for me because it sounds right. It sounds like the nice landing space. It's like in everything. It's the happy ending sort of thing. But when we want to build that in, I'm worried that – and maybe this is just back to the deeply rooted. But let me just give you this hypothetical. There is a spouse who's out drinking with a friend all night because her partner – I will make a woman – her partner is abusive. So just is leaving, right? Friend crashes the car on the median. The police come and say, you know what we're going to do? We're going to take – you're very intoxicated. We're going to take you to a safe space, your home. It takes her back to the abusive spouse who we can assume in this hypothetical – it's totally hypothetical – can't stand when the woman returns home drunk. It leads to a horrible scenario where the woman incurs a huge amount of injury and she goes, I would have been safer had you left me on the median. I would have been safer had you left me in traffic on the West End Bridge. I would have been safer in all these scenarios. You took me to the worst possible safe place even though you went out of your way to drive me home. And so I'm just – this notion of safe space seems – it sounds like a happy ending. But at one level, do you think there would still be a case if the officer took a person home and they said, there was no more dangerous place in the world. I left to get out of the house to avoid this abusive relationship and you returned me. Is there a case in that scenario under our preexisting kind of state-created danger or not? I don't think there is because I don't think that conduct by the police would shock the conscience. Taking someone to a home where they believe she's safer would not be conduct that would shock the conscience. So I don't think that case would survive. What if on the way to the house when the police officer is driving the woman there, she says, please don't take me here. And then relays everything that I just built into the hypothetical and the police officer says, so sorry. I can't leave you on the bridge. I got to take you somewhere and home is my choice. Do we have shock to the conscience then you think? Closer question. Yeah. I think you have a jury question. That's a tougher call. It's all hypothetical. Just curious. Yeah. Yeah. Well, thank you. Thank you. The case is submitted and we will take a brief five minute recess before the next case.